UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE RESOURCE GROUP INTERNATIONAL LIMITED, TRG PAKISTAN LIMITED, MOHAMMED KHAISHGI, AND HASNAIN ASLAM<br><br>Plaintiffs,<br><br>-against-<br><br>MUHAMMAD ZIAULLAH KHAN CHISHTI<br><br>Defendant. | **VERIFIED COMPLAINT**<br><br>Case No.: 23-cv-___ |

Plaintiffs The Resource Group International Limited ("TRG-I"), TRG Pakistan Limited ("TRG-P"), Mohammed Khaishgi and Hasnain Aslam (collectively, "Plaintiffs"), by their undersigned attorneys, for their Complaint against defendant Muhammad Ziaullah Khan Chishti ("Defendant" or "Chishti"), respectfully allege as follows:

## INTRODUCTION

1. This is an action to enjoin an arbitration recently commenced by Defendant – a self-described "inventor, investor, and leader of technology businesses"[1] – asserting claims that he knowingly and voluntarily released. In addition, Plaintiffs seek a declaratory judgment that the Release Agreement (defined below), which includes a forum selection clause specifying New York courts as the exclusive venue for any dispute, supersedes any prior agreement to arbitrate, and that such Release Agreement bars the claims that Defendant seeks to pursue in the arbitration.

2. Defendant was the Chairman and Director of plaintiff TRG-I and the CEO and a Director of plaintiff TRG-P until he resigned from those positions in November 2021 following

---

[1]       *See* Compl. ¶ 31(a), *Chishti v. Spottiswoode*, No. 1:22-cv-03490 (D.D.C. Nov. 13, 2022).

widely reported congressional testimony that he had sexually harassed and assaulted a former employee.  Less than two months later, on January 10, 2022, Defendant signed the Release Agreement in consideration for securing the consent of TRG-I's senior preferred stockholder to Defendant's receipt of approximately US$36.5 million in cash and marketable securities that are currently worth about US$47 million.  In the Release Agreement, Defendant agreed to release – and further covenanted not to sue on – "any and all demands, actions, causes of action, suits, counterclaims, set-offs, defenses, controversies, acts and omissions, liabilities and other claims, both in law and in equity, known or unknown, suspected or unsuspected, which [Defendant] has or ever had against the [Plaintiffs, among others,] from the beginning of time up through the date of this Release Agreement."[2]

3.      Nevertheless, on February 15, 2023, Defendant initiated an arbitration against TRG-I, TRG-P, Khaishgi, Aslam, and non-parties Mohammed Ali Jameel and PineBridge Investments LLC ("PineBridge Investments")[3] before JAMS (the "JAMS Arbitration"), purportedly invoking an arbitration clause contained in a 2005 Preferred Stock Purchase Agreement (the "SPA").[4]  In the JAMS Arbitration, Defendant asserts kitchen-sink claims both in his individual capacity against TRG-I, TRG-P and three of their directors and officers (five of the Plaintiffs in this suit), as well as (self-contradictory) shareholder derivative claims *on behalf of*

---

[2]      Declaration of Katie L. Gonzalez, dated February 28, 2023 ("Gonzalez Decl."), Ex. 1, Conditional Consent and Waiver Agreement and Release Agreement, dated Jan. 10, 2022 ("Release Agreement") ¶ 1.

[3]      The caption of the demand purports to name TRG-P and TRG-I only as "Nominal Respondents" (on whose behalf Defendant purports to bring shareholder derivative claims), but in fact the Demand for Arbitration makes claims *against* both entities as Respondents.  *See, e.g.*, Gonzalez Decl., Ex. 2, Chishti Demand for Arbitration, dated Feb. 14, 2023 ("Demand") ¶¶ 208, 222.

        Contrary to Defendant's assertions in his arbitration demand, PineBridge Investments is neither a party to nor a successor of any party to the arbitration agreement on which Defendant relies.  *See also infra* n.13.

[4]      *See generally* Gonzalez Decl., Ex. 3, Preferred Stock Purchase Agreement, dated Oct. 4, 2005 ("SPA").

TRG-I and TRG-P against the same three individuals and *against each other*.  To the extent the grounds for these nonsensical claims can be discerned from Defendant's arbitration demand (the "Demand"), they are based on an alleged "scheme" to take control of TRG-I and TRG-P away from Defendant, purportedly in violation of certain provisions of the SPA and the fiduciary duties purportedly owed by plaintiffs Khaishgi and Aslam.

4.      According to the Demand, however, "[t]he key vote of the TRG-P board that launched this scheme occurred on December 17, 2021" – 24 days before the date of the Release Agreement.[5]  The claims asserted in the Demand are therefore barred by the very same Release Agreement which allowed Chishti to receive assets worth well in excess of US$50 million, and thus Plaintiffs are entitled to the declaratory and injunctive relief they seek herein.

5.      Specifically, Plaintiffs seek declarations that (i) the Release Agreement, which mandates that any dispute arising from that agreement shall be litigated in state or federal court in New York, supersedes any prior agreement to arbitrate claims within its scope; (ii) the claims asserted in the JAMS Arbitration are barred by the Release Agreement; and (iii) independent of the Release Agreement, Defendant is not entitled to arbitrate his shareholder derivative claims under New York and federal law.

6.      Plaintiffs also seek a temporary restraining order, as well as preliminary and permanent injunctive relief, staying and enjoining the JAMS Arbitration.  Concurrent with this Complaint, Plaintiffs are also submitting a Proposed Order to Show Cause for Temporary Restraining Order and Preliminary Injunction ("Proposed Order to Show Cause"), Memorandum of Law in Support of their Motion for a Temporary Restraining Order and Preliminary Injunction, and Declaration of Katie L. Gonzalez ("Gonzalez Declaration") and exhibits annexed thereto.

---

[5]      Gonzalez Decl., Ex. 2, Demand ¶ 12.

## THE PARTIES

**A.     Plaintiff TRG-I**

7.     Plaintiff TRG-I is a holding company that specializes in investments in software, information services, and technology-enabled service companies.   TRG-I is a corporation incorporated under the laws of Bermuda and has its principal place of business in Bermuda. Accordingly, pursuant to 28 U.S.C. § 1332(c)(1), Plaintiff is a citizen of Bermuda for purposes of 28 U.S.C. § 1332.

**B.     Plaintiff TRG-P**

8.     Plaintiff TRG-P is, and has been at all relevant times, an affiliate and the largest shareholder of TRG-I.   TRG-P is incorporated under the laws of Pakistan and has its principal place of business in Pakistan.   As a result, pursuant to 28 U.S.C. § 1332(c)(1), TRG-P is a citizen of Pakistan for purposes of 28 U.S.C. § 1332.   TRG-P is a public limited company listed on the Pakistan Stock Exchange.   TRG-P is the largest shareholder of TRG-I, controlling approximately 45% of its voting interests.

**C.     Plaintiff Mohammed Khaishgi**

9.     Plaintiff Mohammed Khaishgi is domiciled in, and thus a citizen of, Washington, D.C.   Khaishgi is the current Chief Executive Officer of TRG-I and a Director and Chairman of the TRG-P Board of Directors.

**D.     Plaintiff Hasnain Aslam**

10.     Plaintiff Hasnain Aslam is domiciled in, and thus a citizen of, the State of Maryland. Aslam is the current Chief Investment Officer and Director of TRG-I and the Chief Executive Officer and a Director of TRG-P.

E.     **Defendant Muhammad Ziaullah Khan Chishti**

11.     Upon information and belief, Defendant Chishti is a dual citizen of the United States and Pakistan who is currently domiciled in Puerto Rico.  Accordingly, Chishti is a citizen of Puerto Rico for purposes of 28 U.S.C. § 1332.  Chishti is a founder and former Chairman and Director of TRG-I, the former CEO and Director of TRG-P, and the former Chairman and Chief Executive Officer of Afiniti Limited ("Afiniti"), one of TRG-I's portfolio companies.  Chishti also previously worked at Morgan Stanley as an investment banker and McKinsey & Company as a management consultant.  He also invented Invisalign and co-founded Align Technology to market that product, which was listed on NASDAQ in January 2001.  Chishti received his B.A. from Columbia University and his M.B.A. from Stanford University.

<u>**JURISDICTION AND VENUE**</u>

12.     This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Federal Rule of Civil Procedure 57, and for injunctive relief pursuant to Federal Rule of Civil Procedure 65(a).

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds US$75,000.  Specifically, Plaintiffs are citizens of Washington, D.C., Maryland, and foreign states, while Defendant is a citizen of Puerto Rico, and Plaintiff seeks to enjoin the underlying JAMS Arbitration in which Defendant seeks to recover millions of dollars in damages. *See* 28 U.S.C. § 1332(a)(3) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between . . . citizens of different States and in which citizens or subjects of a foreign

state are additional parties.").[6]

14.     This Court has personal jurisdiction over Chishti because Chishti contractually consented to the Court's jurisdiction in the Release Agreement.[7]  Specifically, the Release Agreement, signed by Defendant, provides for the "exclusive jurisdiction of the state and United States federal courts located in the State of New York."[8]  In addition, this Court has personal jurisdiction over Defendant because this action arises out of Defendant's activities within this District, including by commencing the JAMS Arbitration in New York, New York.

15.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because Chishti contractually consented to venue within this District in the Release Agreement.  Venue is additionally proper because a substantial part of the events giving rise to this action, namely the filing of the JAMS Arbitration, occurred within this District.

## FACTUAL BACKGROUND

### A.     Formation Of TRG-I And TRG-P And The 2005 SPA

16.     Defendant Chishti and plaintiffs Khaishgi and Aslam founded TRG-I and TRG-P in 2002.  TRG-P's sole investment is shares of TRG-I which in turn held (as of early 2021) shares in portfolio companies Afiniti, IBEX Limited ("IBEX"), and E-Telequote Limited ("E-Telequote").  Afiniti is a privately held data and software company group with nearly 2,000 employees that develops artificial intelligence for use in customer call centers.  IBEX is a NASDAQ-listed company with nearly 30,000 employees that offers outsourced customer experience management services, including customer engagement and insight solutions.  E-

---

[6]     Washington, D.C. and Puerto Rico are considered "States" for purposes of 28 U.S.C. 1332(a) pursuant to 28 U.S.C. § 1332(e).

[7]     *See* Gonzalez Decl., Ex. 1, Release Agreement ¶ 2.

[8]     *Id.*

Telequote is a health insurance marketing company (TRG-I sold its stake in E-Telequote on July 1, 2021).

17.     On October 4, 2005, TRG-I, TRG-P, certain entities affiliated with American International Group, Inc. ("AIG"), and members of TRG-I management, including Chishti (collectively, the "Management Shareholders"), entered into the SPA, pursuant to which TRG-I issued certain Series A preferred stock to entities affiliated with AIG – principally a fund then-called AIG Global Emerging Markets Fund II, L.P., now known as PineBridge Global Emerging Markets Fund II, L.P. ("GEM II," and collectively, the "2005 Purchasers") – for approximately US$30 million (as defined in the SPA, the "AIG Shares").[9]

18.     The SPA is governed by New York law, and contains a number of provisions relevant to this action, including:

- Section 8.6 imposes restrictions on TRG-P's and the Management Shareholders' ability to transfer shares or other securities of TRG-I or TRG-P without prior written consent of holders of at least a majority of the AIG Shares.[10]

- Section 8.7 provides that, under certain circumstances, the 2005 Purchasers can cause TRG-I and any of its shareholders to effectuate a sale of all or a portion (an "Approved Sale") of TRG-I's stock or assets to a third party (the "Drag Right").[11]

- Section 10.16 contains an arbitration clause which provides that "[a]ll disputes and controversies arising under or in connection with this Agreement shall be settled by arbitration" conducted in accordance with the JAMS Comprehensive Arbitration

---

[9]     *See generally* Gonzalez Decl., Ex. 3, SPA.

[10]    *Id.* § 8.6(a).

[11]    *Id.* § 8.7.

Rules and Procedures (the "JAMS Rules").[12]

19.     As of late 2021, TRG-I had three series of stock:  Series A Preferred Shares, Series B Preferred Shares and Common Shares, which were held as follows:

- The Series A Preferred Shares, the most senior class of TRG-I's stock, were held by GEM II, AIG Insurance Company, American General Life Insurance Company and Variable Annuity Life Insurance Company.[13]

- The Series B Preferred Shares were held by TRG-P, Chishti and an individual not party to this suit.

- The Common Shares were held by directors and officers of TRG-I, including Defendant Chishti, plaintiffs Khaishgi and Aslam, and other individuals and entities who are not parties to this action.[14]

20.     Other than Plaintiffs, Defendant, the 2005 Purchasers and a non-party management shareholder, none of these shareholders are signatories to the SPA.

21.     Moreover, each of TRG-P and TRG-I have its own Boards of Directors, and many of the directors of each company are not signatories to the SPA, either.

**B.     Chishti's Resignation From TRG-I And TRG-P In The Wake Of Congressional Testimony Accusing Him Of Sexual Harassment**

22.     On November 16, 2021, Tatiana Spottiswoode, a former employee of one of TRG-

---

[12]     *Id.* § 10.16.

[13]     Although GEM II is the largest holder of TRG-I's Series A Preferred Shares, other AIG-affiliated entities, including AIG Insurance Company, American General Life Insurance Company, and Variable Annuity Life Insurance Company, hold a minority of TRG-I's Series A Preferred Shares.  PineBridge Investments does not manage the Series A Preferred Shares for AIG-affiliated entities.  As noted above, PineBridge Investments is also not a party to the SPA and is not a successor in interest to any party to the SPA.

[14]     In addition to Class A Common Shares held by the shareholders named above, TRG-I also had Class B Common Shares held by individuals and entities who are not parties to this action.

I's portfolio companies, Afiniti, publicly testified before the Committee on the Judiciary of the U.S. House of Representatives (the "House Committee") that over a period of "18 months," Chishti "oscillated between pressuring me for sex and punishing me," and that at one point he "beat me while having sex with me," resulting in "bruises around my neck that looked like I had been strangled, a large bump on my head, a black eye."[15]  She further testified that Defendant then "initiated an arbitration *against me*" because he "knew that the secrecy of arbitration would protect him."[16]

23.     Shortly after Ms. Spottiswoode testified before the House Committee, global media outlets widely disseminated Ms. Spottiswoode's testimony and photos, portraying Chishti (in his words) as a "rapist" and a "pedophile."[17]   TRG-P's stock plummeted in light of Ms. Spottiswoode's allegations against Chishti, who was at that time the Chief Executive Officer and Director of TRG-P (in addition to being Chairman and Director of TRG-I).  TRG-I's portfolio companies, particularly including Afiniti, also faced immense pressure from its customers to sever their relationships with Chishti.

24.     As a result, on November 18, 2021, two days after Ms. Spottiswoode's testimony before the House Committee, Chishti resigned from his role as Afiniti Chairman and CEO.  Ten days later on November 28, 2021, Chishti also resigned from his roles as CEO and Director of TRG-P and as Chairman and Director of TRG-I.

25.     Nearly a year later in November 2022, Defendant filed defamation lawsuits in the

---

[15]     Testimony of Tatiana Spottiswoode, House Committee on the Judiciary, dated November 16, 2021, at 1, 3, available at https://docs.house.gov/meetings/JU/JU00/20211116/114227/HHRG-117-JU00-Wstate-SpottiswoodeT-20211116.pdf.

[16]     *Id.* at 3 (emphasis in original).

[17]     *See* Compl. ¶ 1, *Chishti v. Spottiswoode*, No. 1:22-cv-03490 (D.D.C. Nov. 13, 2022) (Chishti noting he was portrayed to Congress and subsequent media coverage as "a rapist, a pedophile, and a potential murderer").

U.S. and U.K. against Ms. Spottiswoode, her father and their respective attorneys relating to Ms. Spottiswoode's sexual harassment and assault allegations against Chishti.[18]

26.     Following these lawsuits filed by Chishti, the House Committee published the previously confidential arbitration award concerning Ms. Spottiswoode's claims against Chishti.[19] That arbitration award, which was made in April 2019, found in favor of Ms. Spottiswoode and determined that Chishti had engaged in "sexual conduct towards [Ms. Spottiswoode]" that was "unwelcome."[20]  The award further found that "the physical injuries inflicted on Ms. Spottiswoode on the evening of September 16, 2017[ ] rose to the level of an assault and battery," and found that Chishti had committed "intentional infliction of emotional distress."[21]  The award ordered Chishti to pay Ms. Spottiswoode US$4,508,903 in damages.

**C.     Deliberations Over Proceeds From TRG-I's Sale Of Its E-Telequote Stake**

27.     Several months before Chishti resigned, in July 2021, TRG-I sold its stake in E-Telequote, one of TRG-I's portfolio companies, to a third-party, Primerica Inc., for an enterprise value of approximately US$600 million in cash.[22]  After using a portion of the sale proceeds to resolve debts and expenses, TRG-I had approximately US$250 million remaining.

---

[18]      *See Chishti v. Spottiswoode*, No. 1:22-cv-03490 (D.D.C. 2022); *Chishti v. Spottiswoode and others* [2022] EWHC KB-2022-004316.

[19]      *See Tatiana Spottiswoode v. Zia Chishti and SATMAP Inc. d/b/a Afiniti* (AAA Case No. 01-17-0007-4093), dated April 19, 2019, at 24, 26, available at https://docs.house.gov/meetings/JU/JU00/20221208/115220/HHRG-117-JU00-20221208-SD999.pdf.

[20]      *Id.* at 24.

[21]      *Id.*

[22]      *See* TRGIL Completes Sale of All Its Economic Stake in Etelequote Ltd, LINK NEWS (July 2, 2021), https://mettisglobal.news/trgil-completes-sale-of-all-its-economic-stake-in-etelequote-ltd/; Primerica Inc. to Acquire TRG Pakistan Limited in a $600 Million Deal, NEWSNRELEASES (Apr. 20, 2021), https://newsnreleases.com/2021/04/20/primerica-inc-to-acquire-trg-pakistan-limited-in-a-600-million-deal/.

28.     In a series of meetings from July 2021 through December 2021 (*i.e.*, before and after Chishti resigned from the TRG-I Board), TRG-I's Board of Directors discussed how to return capital to its shareholders, taking into account relevant tax considerations.

29.     During its December 6, 2021 meeting, the TRG-I Board of Directors determined that it would be in the best interests of the company to make an offer to all TRG-I shareholders to repurchase their TRG-I shares in exchange for a mixture of cash and shares in TRG-I's remaining portfolio companies, Afiniti and IBEX, subject to TRG-I receiving the necessary approvals, including from GEM II.[23]

**D.     Discussions Of Potential Repurchase Of TRG-P's TRG-I Shares**

30.     On December 9, 2021, TRG-I sent a letter to TRG-P's Board of Directors, in which TRG-I made the offer (approved by its Board of Directors) to repurchase the TRG-I shares held by TRG-P in exchange for TRG-P's portion of the cash and shares of Afiniti and IBEX held by TRG-I.  The letter set forth three options for TRG-P:  TRG-I could (1) fully repurchase TRG-P's shares in TRG-I in exchange for a full exit from its investment in TRG-I; (2) partially repurchase TRG-P's shares in TRG-I in exchange for partial exit from its investment in TRG-I; or (3) choose not to repurchase TRG-P's shares in TRG-I.

31.     After further discussions, on December 17, 2021, the TRG-P Board of Directors decided not to request that its TRG-I shares be repurchased, and instead requested an alternative option from TRG-I.  Specifically, TRG-P requested that TRG-I continue to hold the cash and shares that TRG-P would have received in the repurchase transaction and continue to manage those assets for TRG-P's economic benefit, with the cash portion of those assets to be used by a TRG-I wholly-owned subsidiary called Greentree Holdings Limited ("Greentree") to purchase TRG-P

---

[23]     *See* Gonzalez Decl., Ex. 4, TRG-I Board Meeting Minutes, dated Dec. 6, 2021.

shares on the open market as a return of value to TRG-P's shareholders.

**E.      Changes Made To Secure Required Consent To Repurchase Transactions**

32.      This structure was a beneficial accommodation that TRG-I was willing to make for

TRG-P, but it had the potential to prejudice the TRG-I's other shareholders – in particular, the

2005 Purchasers – vis-à-vis TRG-P, because a substantial share of the 2005 Purchasers' shares

would be repurchased, while TRG-P's would not.  Without some counterbalancing change, this

would increase TRG-P's percentage ownership of TRG-I relative to other shareholders, giving

TRG-P majority control of TRG-I when it had not previously had such control.  In order to

counterbalance a disruption to existing shareholder rights, and in an effort to secure the consent of

the 2005 Purchasers (which was required to effect the proposed repurchase), TRG-P agreed to a

deal pursuant to which TRG-P would newly get the right to name three directors, but its voting

interest in TRG-I would be capped at approximately 45% (mirroring its voting interest prior to the

repurchase transactions), and the number of directors serving on the TRG-I Board of Directors

would reflect that voting interest.  In return, TRG-P pushed for and received the 2005 Purchasers'

agreement to eliminate their Drag Right from the SPA.  As such, in the final, negotiated outcome,

the number of installable directors on the TRG-I Board was reduced to seven, to be made up of

three TRG-P designees, two designees named by the holders of a majority of the AIG Shares, the

TRG-I CEO, and an independent individual recommended by TRG-P and approved by holders of

the majority of the AIG Shares (with the three remaining seats being vacant), and the 2005

Purchasers agreed to eliminate their Drag Right and to loosen other covenants that would have

otherwise applied to TRG-I.

33.      Accordingly, TRG-I amended its Bye-Laws effective December 19, 2021 to,

among other things, implement the negotiated agreement that only seven of the ten Board seats be

filled and the last three seats remain vacant.[24]   Specifically, Bye-Law 73(a) was amended to provide:

> that the seats on the Board of Directors of [TRG-I] shall be filled by seven (7) directors as set out below, with any additional seats remaining vacant:
>
> (1) two individuals designated . . . by the [Series A Preferred Shareholders] . . . ;
>
> (2) three individuals designated . . . by [TRG-P] . . . ;
>
> (3) one individual who is [TRG-I]'s Chief Executive Officer . . . ;
>
> (4) one individual who is independent and who is of high character with a strong reputation and who has relevant experience as an independent director on boards of other companies, which director shall be recommended by [TRG-P] and approved by [the Series A Preferred Shareholders] . . . "[25]

34.    Bye-Law 1(b) was also amended to provide that "in the event that any provision of the [SPA] conflicts with Bye-Law 73(a), such provisions of the Bye-Laws shall prevail, and each Member shall vote all of its shares of [TRG-I] to give precedence to such provisions of the Bye-Laws over the [SPA]."[26]

35.    These changes – including capping TRG-P's voting interest at approximately 45%, eliminating the Drag Right, and amending certain covenants – were also reflected in an amendment to the SPA dated December 19, 2021.[27]

36.    The Bye-Laws were later amended a third time on January 19, 2022 to implement

---

[24]    *See* Gonzalez Decl., Ex. 6, TRG-I Second Amended and Restated Bye-Laws, dated Dec. 19, 2021 ("Second Amended and Restated Bye-Laws").  Although the amendment to the Bye-Laws regarding the number of Board seats that would be filled went into effect on December 19, 2021, TRG-I had not filled all ten Board seats for many years prior.

[25]    Gonzalez Decl., Ex. 6, Second Amended and Restated Bye-Laws, Bye-Law 73(a).

[26]    Gonzalez Decl., Ex. 6, Second Amended and Restated Bye-Laws, Bye-Law 1(b).

[27]    *See* Gonzalez Decl., Ex. 5, TRG-I Board Meeting Minutes, dated Dec. 19, 2021.

certain post-repurchase share exchanges, but these amendments are not relevant to this dispute.[28]

**F.   Chishti Seeks To Accelerate Repurchase Of His TRG-I Shares While Attempting To Take Over Control Of TRG-P**

37.     Chishti ultimately opted to participate in the repurchase transactions offered by TRG-I.  At the same time, however, Chishti, having resigned a few weeks earlier, was trying to take over control of TRG-P and, in turn, TRG-I, even if that meant breaching his obligations under the SPA.

38.     Specifically, Chishti embarked on an apparent attempt to take over control which began with TRG-P's next Extraordinary General Meeting ("EGM"), scheduled to take place on January 11, 2022.  The purpose of the EGM was to elect new Directors for three years because the terms of the then-present TRG-P Board of Directors expired on January 14, 2022.

39.     Pursuant to Section 8.5(a) of the SPA, Chishti was required to "vote all [the TRG-P] Securities over which [he] has voting control, and . . . take all other necessary or desirable actions within [his] control," such that the two individuals designated by GEM II were elected to the board of TRG-P, a long-standing obligation that Chishti had previously honored.[29]

40.     Despite his obligations under the SPA to vote in favor of at least two individuals designated by GEM II at the EGM, Chishti signaled that he was prepared to violate the voting requirements in the SPA.  He nominated a slate of directors that excluded the GEM II designees and instead put forth himself and his allies, including his mother.

---

[28]     Chishti incorrectly alleges in his Demand for Arbitration that the Third Amended and Restated Bye-Laws, which became effective after the Release Agreement, changed the composition of the TRG-I Board.  *See* Gonzalez Decl., Ex. 2, Demand ¶ 99.  This is incorrect.  The Board changes were made in the Second Amended and Restated Bye-Laws, which went into effect on December 19, 2022 – *before* the Release Agreement.  *See* Gonzalez Decl., Ex. 6, Second Amended and Restated Bye-Laws.  Chishti alleges that these fully released changes to the Second Amended and Restated Bye-Laws "completed" the "improper takeover of control of TRG-I."  *See* Gonzalez Decl., Ex. 2, Demand ¶ 98.

[29]     Gonzalez Decl., Ex. 3, SPA § 8.5(a).

41.     At the same time, Chishti was pushing to have TRG-I repurchase his Class A Common Shares and Series B Preferred Shares of TRG-I immediately.  Upon information and belief, Chishti desired immediate liquidity from the repurchase transactions to finance purchases of additional TRG-P securities to increase his voting power at the next EGM and therefore increase his chances of electing himself and his allies to the TRG-P Board.

42.     Pursuant to Section 8.6(a) of the SPA, however, Chishti was not permitted to have TRG-I repurchase his shares without the prior consent of GEM II.[30]

43.     Chishti's attempts to take over control of the TRG-P Board became clear on January 3, 2022, when TRG-P distributed, pursuant to Section 159(4) of Pakistan's 2017 Companies Act, a notice containing the list of individuals who had been nominated for election as directors of TRG-P.  The list included twenty-six individuals, including Chishti, as well as at least four individuals with known affiliations with Chishti, including his mother, his half-brother, and two long-time business associates.

## G.     The Release Agreement

44.     Although it appeared that Chishti was prepared to violate the SPA by refusing to vote his shares in favor of GEM II's nominees at the upcoming EGM, Chishti still needed the consent of holders of the Series A Preferred Shares to effect the transfer of Chishti's shares in TRG-I.  Ultimately, to secure the necessary consent to the sale and transfer of his Series B Preferred Shares, Chishti negotiated to enter into a Conditional Consent and Waiver Agreement (the "Consent Agreement"), pursuant to which GEM II agreed to waive the transfer restrictions on the transfer of the Class A Common Shares and Series B Preferred Shares by Chishti and a company wholly owned by him, and Chishti agreed to abide by his obligations to vote in favor of

---

[30]     Gonzalez Decl., Ex. 3, SPA § 8.6(a).

GEM II's nominees and to release TRG-I and its shareholders, affiliates, and others from all known and unknown claims. Specifically, pursuant to the Consent Agreement, the Series A Preferred Shareholders agreed to waive the transfer restrictions in Section 8.6(a) of the SPA and consent to Chishti's sale and transfer of shares, on the conditions that (i) GEM II's nominees were actually elected to the TRG-P Board at the January 11, 2022 EGM in accordance with Chishti's obligations under the SPA; (ii) Chishti execute a release agreement, which he signed on January 10, 2022 (the "Release Agreement"); [31] and (iii) Chishti shall not have commenced litigation or other proceedings against TRG-I and certain other parties.

45.     In the Release Agreement, Chishti agreed to release and covenanted not to sue with respect to any and all claims against TRG-I and its affiliates and shareholders, such as TRG-P and GEM II, and its directors, such as Khaishgi and Aslam. The Release Agreement provides:

> Effective upon execution and delivery of the Conditional Waiver by the signatories thereto, each of the undersigned, for itself and on behalf of each of its affiliates, successors, related persons and any other person claiming by through the undersigned, hereby releases (and covenants not to sue) the Company [*i.e.*, TRG-I] and each of its affiliates, subsidiaries and current and former shareholders, and their respective directors, officers, members, agents, employees, attorneys, consultants and professional advisors (such persons, collectively, the "**Released Parties**") from any and all demands, actions, causes of action, suits, counterclaims, set-offs, defenses, controversies, acts and omissions, liabilities and other claims, both in law and in equity, known or unknown, suspected or unsuspected, which such person has or ever had against the Released Parties from the beginning of time up through the date of this Release Agreement.[32]

46.     The Release Agreement also contains a merger clause, which states that the Release Agreement "constitute[s] the entire agreement among the parties with respect to the subject matter

---

[31]     *See* Gonzalez Decl., Ex. 1, Release Agreement.

[32]     *Id.* ¶ 2.

hereof and supersede[s] all prior arrangements or understandings."[33]

47.      The Release Agreement is governed by New York law, and the parties to the Release Agreement – including Chishti – agree to "submit to the exclusive jurisdiction of the state and United States federal courts located in the State of New York."[34]  The Release Agreement does not contain an arbitration provision.

## H.      Events After The Release Agreement

48.      The Consent Agreement and Release Agreement allowed Chishti to receive significant repurchases in the amount of approximately US$36.5 million in cash and 1,679,674 common shares in IBEX, which are marketable securities (traded on NASDAQ) and have a current market value of approximately US$47 million.[35]

49.      At the January 11, 2022 EGM, the TRG-P shareholders elected the two GEM II nominees to the TRG-P Board, as well as three known associates of Chishti.  The election of three Board members who are, upon information and belief, controlled by Chishti has caused significant disruption to TRG-P's management and business.

50.      In the meantime, following the TRG-P Board's decision in December 2021, Greentree began the share purchase transactions in late December 2021 by purchasing TRG-P shares on the open market.

51.      Chishti's pursuit to take over control of TRG-P (and thus TRG-I) did not end with the January 2022 EGM.  In September 2022, Chishti began to rapidly acquire TRG-P securities

---

[33]      *Id.*

[34]      *Id.*

[35]      On February 28, 2023, the stock price of an IBEX share was US$27.95.  *See* GOOGLE FINANCE https://www.google.com/finance/quote/IBEX:NASDAQ?sa=X&ved=2ahUKEwicxL2uoLT9AhVNGVkFHdKZAy YQ3ecFegQIJhAY (last visited Feb. 28, 2023, 4:00 PM).

with the assistance of his wife.  Upon information and belief, Chishti and/or his wife opened accounts at various Pakistani banks and pledged TRG-P shares in order to finance the purchase of additional TRG-P shares and futures.  These actions were in breach of the SPA's restrictions on the unauthorized "Transfer" of TRG-P shares (the SPA defines "Transfer" to include encumbrances).[36]

52.   Accordingly, TRG-I filed an unrelated Demand for Arbitration with JAMS on January 12, 2023 to halt Chishti's continuing breaches of the SPA.[37]  Given that TRG-P is the largest shareholder of TRG-I, if Chishti were to acquire control of a majority of the voting shares of TRG-P, he would be able to exercise significant control over both companies, including their portfolio companies.  That, in turn, poses an existential threat to TRG-P, TRG-I, their portfolio companies, and other shareholders.  Given the negative publicity surrounding Chishti, his taking control would almost certainly create a value-destroying downward spiral – in which customers and clients of Afiniti and IBEX would likely cut ties with the companies (which is exactly what they had threatened to do when Ms. Spottiswoode's allegations first came to light in November 2021) – from which the companies may not survive.  Notably, in his response to TRG-I's Demand for Arbitration, Chishti did not deny that he was planning to attempt to take control of TRG-P.

## I.   Chishti's JAMS Arbitration And Breach Of The Release Agreement

53.   On February 15, 2023, Chishti initiated the JAMS Arbitration in New York.  In his Demand for Arbitration, Chishti asserts a confused and contradictory combination of direct claims and derivative claims against Plaintiffs in this action – TRG-I, TRG-P, Khaishgi and Aslam – and

---

[36]     *See* Gonzalez Decl., Ex. 3, SPA § 8.6(a).

[37]     Unlike the claims Defendant asserts in his Demand here, the claims asserted by TRG-I in this separate arbitration are not covered by the Release Agreement and thus are the subject of the SPA's arbitration clause.

non-parties Mohammed Ali Jameel and PineBridge Investments (collectively, the "Respondents"), and alleges that the Respondents engaged in a scheme to wrest control over TRG-I and TRG-P through the transactions and corporate governance changes discussed above that occurred in late 2021 (before the date of the Release Agreement) in violation of the SPA and various Bermudan and Pakistani laws.[38]

54.    Pursuant to the JAMS Rules, a respondent has 14 days to respond to a demand for arbitration.[39]   Since counsel for Chishti emailed copies of the Demand for Arbitration to respondents TRG-I, TRG-P, Khaishgi, and Aslam (*i.e.*, Plaintiffs) on February 15, 2023, the deadline for them to respond to Chishti's Demand is on March 1, 2023 (*i.e.*, the date of this Complaint).  Moreover, Chishti has attempted to invoke the Expedited Procedures of the JAMS Rules which, if applied, will accelerate the arbitration timeline.[40]

55.    In light of these deadlines, as well as the JAMS Rule stating that any jurisdictional challenge "shall be deemed waived, unless asserted in a response to a Demand [for Arbitration] . . . or promptly thereafter, when circumstances first suggest an issue of arbitrability,"[41] Plaintiffs submit this Complaint and accompanying Proposed Order to Show Cause, Memorandum of Law, and supporting Gonzalez Declaration seeking immediate relief from this Court to temporarily restrain and preliminarily enjoin the JAMS Arbitration.[42]

---

[38]     Gonzalez Decl., Ex. 2, Demand.

[39]     *See* JAMS Comprehensive Arbitration Rules and Procedures, available at https://www.jamsadr.com/rules-comprehensive-arbitration/ ("JAMS Rules"), Rule 9.

[40]     *See* JAMS Rules, Rule 16.1.

[41]     JAMS Rules, Rule 9(f).

[42]     Immediately after filing this Complaint, Plaintiffs intend to submit a letter notifying JAMS of this proceeding and suggesting that JAMS should stay the JAMS Arbitration until this Court can rule on Plaintiffs' motion for a preliminary injunction.

## CLAIMS FOR RELIEF

### COUNT I
### (First Request for Declaratory Judgment – Release Agreement Supersedes Any Agreement to Arbitrate)

56.     Plaintiffs repeat and reallege paragraphs 1 through 55, as if fully set forth herein.

57.     This claim is brought under the Release Agreement, which is a valid and enforceable agreement.

58.     In the Release Agreement, Defendant expressly agreed to the "exclusive jurisdiction of the state and United States federal courts located in the State of New York" for any claims arising from the Release Agreement.[43]

59.     The Release Agreement also contains a merger clause which clearly states that the Release Agreement supersedes all prior agreements, which includes the arbitration clause in the SPA.

60.     Plaintiffs are intended third-party beneficiaries of the Release Agreement, and under New York law are therefore entitled to enforce the release, covenant not to sue and forum selection clause against Defendant.

61.     An actual controversy has arisen and now exists between the parties as to whether the Release Agreement superseded any prior agreement to arbitrate between the parties. Specifically, notwithstanding the forum selection and merger clauses of the Release Agreement, Defendant filed claims within the scope of the Release Agreement in arbitration.

62.     Declaratory relief will resolve this controversy.

63.     Therefore, Plaintiffs are entitled to a declaration pursuant to 28 U.S.C. § 2201, *et seq.* and Federal Rule of Civil Procedure 57 that the Release Agreement superseded and rendered

---

[43]     Gonzalez Decl., Ex. 1, Release Agreement ¶ 2.

null and void any prior agreement in the SPA to arbitrate claims governed by the Release Agreement, including the question whether and to what extent the Release Agreement covers the claims asserted in the JAMS Arbitration.

## COUNT II
### (Second Request for Declaratory Judgment – Release Agreement Bars Claims Asserted in the JAMS Arbitration)

64.     Plaintiffs repeat and reallege paragraphs 1 through 63, as if fully set forth herein.

65.     Pursuant to the Release Agreement, Chishti released the claims asserted in the JAMS Arbitration.  In addition, Chishti covenanted not to sue on those claims.

66.     An actual controversy has arisen and now exists between the parties as to whether the Release Agreement bars the claims asserted in the JAMS Arbitration.   Specifically, notwithstanding the release and covenant not to sue, Defendant has asserted claims covered by the Release Agreement in the JAMS Arbitration.

67.     Declaratory relief will resolve this controversy.

68.     Therefore, Plaintiffs are entitled to a declaration pursuant to 28 U.S.C. § 2201, *et seq.* and Federal Rule of Civil Procedure 57 that the Release Agreement bars the claims asserted by Chishti in the JAMS Arbitration.

## COUNT III
### (Third Request for Declaratory Judgment – Defendant's Shareholder Derivative Claims Are Not Arbitrable)

69.     Plaintiffs repeat and reallege paragraphs 1 through 68, as if fully set forth herein.

70.     Chishti purports to assert shareholder derivative claims in the JAMS Arbitration on behalf of TRG-I and TRG-P.

71.     TRG-I has numerous shareholders who are not signatories to the SPA and therefore did not consent to arbitration.  TRG-P has thousands of shareholders who are not signatories to the SPA and therefore did not consent to arbitration.  Several Directors of TRG-I and TRG-P –

including Directors Chishti accuses in the JAMS Arbitration of being conflicted and incapable of considering a demand – are not signatories to the SPA and also did not consent to arbitration.

72.     By asserting derivative claims on behalf of TRG-P and TRG-I, Chishti seeks to bind these non-parties to the outcome of a private arbitration to which they did not consent, and in which they would have no opportunity to appear or participate.

73.     An actual controversy has arisen and now exists between the parties as to whether the derivative claims alleged in the JAMS Arbitration are arbitrable.

74.     Declaratory relief will resolve this controversy.

75.     Therefore, Plaintiffs are entitled to a declaration pursuant to 28 U.S.C. § 2201, *et seq.* and Federal Rule of Civil Procedure 57 that the derivative claims asserted in the JAMS Arbitration are not arbitrable.

### COUNT IV
### (For Injunctive Relief Staying and Enjoining the JAMS Arbitration)

76.     Plaintiffs repeat and reallege paragraphs 1 through 75, as if fully set forth herein.

77.     Pursuant to the Release Agreement, Chishti released the claims asserted in the JAMS Arbitration.  In addition, Chishti covenanted not to sue on those claims.

78.     Plaintiffs will suffer irreparable harm if forced to participate in the JAMS Arbitration to defend against claims that Defendant had agreed to release and covenanted not to sue.

79.     The balance of hardships and public interest weigh in Plaintiffs' favor.  Defendant would suffer minimal harm if he is ordered to abide by his contractual obligations in the Release Agreement, in contrast to the irreparable harm Plaintiffs will suffer including the time and resources expended in defending themselves in an arbitration barred by the Release Agreement and facing the uncertainty associated with the JAMS Arbitration.

80.     Money damages will not be sufficient to remedy the irreparable harm suffered by Plaintiffs if forced to defend against claims that Defendant had agreed to release and covenanted not to sue, and thus the JAMS Arbitration should be enjoined.

## COUNT V
### (For Breach of Contract – Release Agreement)

81.     Plaintiffs repeat and reallege paragraphs 1 through 80, as if fully set forth herein.

82.     The Release Agreement is a valid and binding contract.

83.     Plaintiffs are intended third party beneficiaries of the Release Agreement.

84.     Pursuant to the Release Agreement, Chishti released the claims asserted in the JAMS Arbitration.  In addition, Chishti covenanted not to sue on those claims.

85.     The Release Agreement also provided for "exclusive jurisdiction of the state and United States federal courts located in the State of New York."

86.     Chishti has breached the Release Agreement by asserting claims in the JAMS Arbitration that he released and promised not to assert.

87.     Plaintiffs have been damaged by Chishti's breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor as follows:

i.      declaring that the valid and binding Release Agreement superseded and rendered null and void any prior agreement to arbitrate claims within the scope of the Release Agreement;

ii.     declaring that the claims asserted by Chishti in the JAMS Arbitration are barred by the Release Agreement;

iii.    declaring that the shareholder derivative claims asserted by Chishti in the JAMS

        Arbitration are not arbitrable;

iv.     temporarily restraining the JAMS Arbitration;

v.      preliminarily and permanently enjoining the JAMS Arbitration;

vi.     awarding Plaintiffs their costs and attorneys' fees incurred in this action and in the

        JAMS Arbitration; and

vii.    granting such other relief as the Court deems just, equitable, and proper.


Dated: New York, New York
        March 1, 2023

                                    Respectfully submitted,

                                    CLEARY GOTTLIEB STEEN &
                                    HAMILTON LLP

                                    Jeffrey A. Rosenthal
                                    Lisa Vicens
                                    Mark E. McDonald
                                    Charity E. Lee
                                    Katie L. Gonzalez
                                    One Liberty Plaza
                                    New York, NY 10006
                                    Tel: (212) 225-2000
                                    jrosenthal@cgsh.com
                                    mmcdonald@cgsh.com
                                    evicens@cgsh.com
                                    CharityLee@cgsh.com
                                    kgonzalez@cgsh.com

                                    *Attorneys for Plaintiffs TRG-I, Mohammed
                                    Khaishgi and Hasnain Aslam*

                                          – and –

-24-

COHEN & GRESSER LLP

S. Gale Dick
Christine M. Jordan
800 Third Avenue
New York, NY 10022
Tel:  (212) 707 7600
sgdick@cohengresser.com
cjordan@cohengresser.com

*Attorneys for Plaintiff TRG-P*

## **VERIFICATION**

STATE OF NEW JERSEY        )
                                      )    SS

COUNTY OF SOMERSET       )

I, Pat Costello, depose and state as follows:

I am the General Counsel and Assistant Corporate Secretary of The Resource Group International Limited ("TRG-I"), one of the plaintiffs in this action. I have reviewed the foregoing Verified Complaint (the "Complaint"). To the extent the allegations in the Complaint concern matters of which I have personal knowledge, I know these allegations to be true and correct. To the extent the allegations in the Complaint concern matters of which I do not have direct personal knowledge, I believe the allegations to be true and correct.

_____
Pat Costello

SWORN TO AND SUBSCRIBED before me
this ⟨2̲7̲⟩ day of February 2023.

_____
Notary Public

REKASH PURAN
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires March 22, 2026